FILED
Mar 05, 2026
12:59 PM(CT)
TENNESSEE
WORKERS' COMPENSATION
APPEALS BOARD



# TENNESSEE BUREAU OF WORKERS' COMPENSATION
## WORKERS' COMPENSATION APPEALS BOARD

| | |
|---|---|
| Terry Gandy | Docket No      2023-02-3636 |
| v. | State File No.    860226-2023 |
| Marten Transport, Limited, et al. | |
| Appeal from the Court of Workers' Compensation Claims Brian K. Addington, Judge | Heard February 12, 2026 in Knoxville, Tennessee |

---

### Affirmed in Part, Modified in Part, Vacated in Part, and Remanded

In this interlocutory appeal, the employer argues the trial court erred in determining the employee's injury and subsequent need for medical treatment were primarily caused by a work accident. While working as a truck driver for the employer, the employee alleged he scratched his arm, causing a minor cut or laceration, which became infected. The employee developed necrotizing fasciitis, requiring amputation of his left arm and multiple surgeries on his right arm. The employer denied the claim, contending the employee injured his arm elsewhere, that he did not properly care for his wound, and that his underlying medical conditions were the primary cause of the infection's worsening into necrotizing fasciitis. At the expedited hearing, both parties presented testimony from physicians specializing in infectious disease, and the employee presented proof from a psychiatrist that his preexisting depression had worsened following his amputation. The trial court found the employee suffered an injury while at work, which was the primary cause of the infection and the need for the amputation. The court awarded medical benefits, including the payment of past medical bills, treatment with an infectious disease physician, and the provision of a panel of psychiatrists. The trial court also found the employee was presumably entitled to temporary total disability benefits but reserved ruling on the amount due to the lack of proof in the record. The employer has appealed. Having carefully reviewed the record and the arguments of counsel, we affirm the trial court's finding that the employee will likely prevail at trial in establishing he suffered an injury in the course and scope of his employment that is the primary cause of his need for medical treatment; we modify the award for medical benefits; we vacate the award of temporary total disability benefits; and we remand the case.

Judge Meredith B. Weaver delivered the opinion of the Appeals Board in which Presiding Judge Timothy W. Conner and Judge Pele I. Godkin joined.

Connor R. Sestak, Nashville, Tennessee, for the employer-appellant, Marten Transport, Limited

Ashley B. McGee, Nashville, Tennessee for the employee-appellee, Terry Gandy

**Factual and Procedural Background**

Terry Gandy ("Employee") worked as a truck driver for Marten Transport, Limited ("Employer"). Typically, Employee picked up items from Employer's distribution center in Shelbyville, Tennessee, and delivered them to various Walmart locations. In April 2023, while completing deliveries, Employee alleged he scratched his wrist on trailer components, causing a small cut or laceration. Over the course of the following days, while Employee continued to work, he began experiencing extreme fatigue and vomited several times. He also noticed that the skin around the wound was beginning to turn black. Employee called dispatch early on April 22, stating he did not feel well. Later that day, he returned to the Shelbyville location with slurred speech and difficulty walking. His manager, believing Employee was intoxicated, took him to the emergency room. At the emergency room, Employee reported falling at work earlier, although he could not recall where or when, and it was noted that he had a skin tear on his left arm and hand with swelling. Doctors stabilized Employee but determined he needed a higher level of care and sent him to Vanderbilt University Medical Center ("Vanderbilt") via medical flight. Upon arrival at Vanderbilt, doctors noted Employee had significant bruising from his shoulder to his fingertips on his left arm, as well as a "large abrasion" to his left upper arm. The providers at Vanderbilt quickly determined there was no brain trauma from the reported fall but that Employee had severe streptococcus group A, or a strep pyogenes infection ("Strep A"), which developed into necrotizing fasciitis, commonly known as "flesh eating bacteria." Employee's left arm had to be amputated the morning of April 23, and his right arm also required significant treatment for infection. By the time Employee was discharged from Vanderbilt on May 21, his medical bills totaled over $700,000.00.

On May 4, 2023, Employer's senior workers' compensation claim representative issued a letter to Employee "denying liability for payment of any workers' compensation benefits" for his injury. On May 24, 2023, Employee filed a petition for benefit determination stating that he "was delivering product to vendor when he cut his hand on the trailer that was attached to the truck he was driving." Employer then provided a panel of infectious disease physicians from which Employee chose Dr. Karen Bloch. However, an appointment was never scheduled, and Employee received no follow-up care after his discharge from Vanderbilt.

Employee obtained a records review by Dr. Michael Gelfand, an infectious disease specialist practicing in Memphis. Dr. Gelfand completed a questionnaire on October 23, 2024, wherein he responded in the affirmative to the question: "[I]s it your opinion that, to a reasonable degree of medical certainty, [Employee's] left upper extremity condition and

2

injury, including the need for a left upper extremity amputation, primarily, meaning **more than 50%**, arose out of the April 22, 2023 work injury?" (Emphasis in original.) The parties then took Dr. Gelfand's deposition in January 2025. Dr. Gelfand testified he had reviewed the medical records from the emergency room as well as Vanderbilt in formulating his opinion that Employee's necrotizing fasciitis and need for amputation were primarily caused by the laceration that occurred at work. Specifically, he testified:

> Group A strep is a frequently present organism, but it's [an] extremely rare cause of severe invasive infection and requires either an injury or [an] underlying immunity deficiency. And so[,] it really needs a place to enter the tissue. So[,] the abrading or lacerating the arm allowed the organism to enter into the arm.

Dr. Gelfand went on to say that Strep A is an organism that does not live on inanimate objects but on human skin. According to Dr. Gelfand, Strep A can live on the skin for weeks or months in anywhere from ten to twenty percent of people, but "in most people[,] it doesn't invade unless [an] injury occurs." He further clarified that Employee's "necrotizing soft tissue infection of the arm would not have developed without a penetrating injury, allowing the organism to enter the tissues of the arm to progress to cause severe infection . . . and to spread to the right arm as well." Regarding the progress of the infection, Dr. Gelfand testified that it usually takes from one to three days from the time of the introduction of the bacteria into the body for an infection to develop. Finally, Dr. Gelfand confirmed the medical treatment that Employee received at Vanderbilt was "medically necessary as a result of" Employee's laceration injury at work.

Employer retained Dr. Anthony Cumbo, an infectious disease specialist practicing in New York. Dr. Cumbo wrote a letter dated August 1, 2025, in which he opined Employee's laceration introduced Strep A into the subcutaneous tissue. However, he went on to state:

> [Employee] was at high risk for the development of a severe infection due to his advanced vascular disease, his immunocompromise from his lung cancer, his persistent smoking . . ., and his failure to timely seek medical care . . . .
>
> . . . .
>
> The necrotizing fasciitis and [the] need for amputation w[ere] not primarily caused by the work injury to [Employee's] arm, but [by] his above[-]noted poor health and treatment delay.[1]

---

[1] Employee was diagnosed with unrelated advanced stage lung cancer shortly after his work injury.

Following receipt of Dr. Cumbo's opinion, Employee filed a request for expedited hearing on September 2, 2025. The request was supported by Employee's affidavit, dated August 29, 2025. Among other things, the affidavit stated: "On or around April 23, 2023, while in the course and scope of my employment for Employer in Bedford County, Tennessee, I suffered injuries to my left and right arm[s]."

The parties deposed Dr. Cumbo in October 2025, who agreed with Dr. Gelfand that Strep A lives on human skin, stating that "[a]ll of us at some point or another are usually colonized with it on our skin" and that "[i]n most people, if they develop an infection, they don't really develop much of a problem." However, in regard to how long it takes for a person infected with Strep A to show symptoms, he testified: "It depends on the host factors again. [A person who is immunocompromised due to chemotherapy] can get very sick within hours . . . . Other patients that have a less deficient immune system . . . that can take hours to days." Dr. Cumbo agreed with Dr. Gelfand that there must be a "portal of entry" for the bacteria, but he disagreed as to the reason the bacteria became necrotizing fasciitis, stating: "It's more of a host factor that allowed this to progress to a severe necrotizing fasciitis. It's not the . . . mechanism of injury at work. It's because of his underlying immunocompromise." Dr. Cumbo also posited that Dr. Gelfand might not be aware of all of Employee's preexisting conditions and his subsequent cancer diagnosis based on the medical records Dr. Gelfand indicated he had reviewed in his deposition. As a result, Employee's counsel forwarded another questionnaire to Dr. Gelfand in which he affirmed that the "laceration wound [Employee] sustained . . . is primarily . . . the cause of [his] left arm amputation, considering all causes."

The trial court issued a scheduling order and set an expedited hearing for November 12, 2025. Employee filed his exhibits on October 18, which included a "Sworn Affidavit of Terry Gandy." This affidavit provided more information about the incident than the August 29 affidavit, stating, in part:

2.  On April 18, 2023, I traveled from Jonesborough, Tennessee[,] to Shelbyville, Tennessee[,] to the Distribution Center to report for [my] work shift[,] arriving at approximately 12:00 [to] 12:30 p.m. CST.

    . . . .

4.  [On April 19, 2023] . . . at approximately 12:30 [to] 1:00 a.m. CST[,] I left the Shelbyville Distribution Center for Cookeville, Tennessee Walmart for the first drop off. The trailer has a roll door on the rear which allows me to release the latch for access to the interior of the trailer.

    . . . .

4

7. At approximately 2:45 [to] 3:00 a.m.[,] I traveled from Algood to Crossville, Tennessee Walmart . . . . As I raised [] one of the compartment roll doors to allow the Associate to pick up product, the door scratched my arm down by the wrist on the top side of my arm.

. . . .

9. On April 21, 2023, I was not feeling well but it was a new workday, so I pushed through since I live in my truck three to four weeks at a time and proceeded to go to the Shelbyville Distribution Center and pick up my first load of the night.

10. After the second delivery in Bowling Green, [Kentucky], I was feeling pretty bad, so I took a nap for about an hour then I drove down to Goodlettsville[, Tennessee,] to the Tyson Distribution Center . . . .

11. The trip from Goodlettsville to Shelbyville is approximately 65 miles and it took me 7 [to] 8 hours to make the trip as I had to stop numerous times because I was having issues staying awake and functioning properly. When I arrived in Shelbyville at approximately 10:00 p.m. on April 22, 2023, I was taken to the hospital by my supervisor.

Employee also filed a report from psychiatrist Dr. Greg Kyser. Dr. Kyser relied on Employee's medical records, Dr. Gelfand's report, and his in-person meeting with Employee in formulating his opinion. He diagnosed Employee with adjustment disorder with anxiety and depression, partially in remission and opined this diagnosis was primarily caused by the work accident and Employee's arm amputation. He observed that, although Employee was previously on Zoloft for anxiety, a recent dosage increase of that medication was primarily due to his increased distress following the work accident and amputation.

At the November 12, 2025 expedited hearing, both Employee and his wife testified in person. During his testimony, Employee at various times identified different dates on which he said the accident occurred, stating that it happened on April 19, April 20, or April 21. However, he consistently testified that the accident occurred on a Wednesday. As to how the accident occurred, Employee stated:

They had those . . . the two bulkheads up there and it was secured with like a safety belt and sometimes those guys got it pretty cotton[-]picking tight. Whenever you released it[,] it'd pop out and get you and this is just one time it popped out and hit my arm and scratched it really good.

Employee further testified he "put some Neosporin on [the cut]," maybe wiped it clean with a wet paper towel, and possibly put a Band-Aid on it. Employee said the cut was

5

about two inches long and it did not bleed very much or for very long. The following evening, he noticed his skin around the cut had begun to turn black. He testified that he usually had significant bruising with just a slight "bump," and that is what he believed was happening to his arm.

Over the course of the following day, Employee vomited two to three times and became fatigued. He testified he believed he had the flu. He began his return trip to the distribution center in Shelbyville but had to stop repeatedly to rest; according to Employee's testimony, it took him eight hours to travel sixty-five miles. At some point in that day, he lost control of his bodily functions. When he returned to the distribution center, he had poor balance and slurred speech. Employee testified his supervisor believed he was intoxicated and took him to the emergency room, where he received the medical care described above.

Regarding his condition as of the date of the hearing, Employee stated he had "phantom pains" from his amputation and had weakness in his right arm. He also testified he was self-conscious and suffered from depression. On cross-examination, Employee admitted he was "off work" the weekend before his injury but denied that he cut or scratched his arm while performing chores at home. He further admitted that his affidavits, deposition, and trial testimony varied as to the date of injury and the precise mechanism of injury. Employee testified he did not remember signing at least one of the affidavits he completed, but he vaguely remembered giving his deposition.

Employee's wife testified she and Employee spoke daily when he was working. At some point during the week in question, Employee told her about the injury, which he described as a "normal cut," and that it resulted from being hit by a belt in the truck. She could not recall if that conversation occurred on a Wednesday or Thursday. She further testified that since the injury and amputation, Employee needs help getting dressed and cooking dinner and that he was withdrawn. On cross-examination, Employee's wife admitted Employee built a curio cabinet the weekend before his injury, using a hammer, nails, and a saw. However, she testified she saw nothing to indicate Employe had cut or otherwise hurt himself that prior weekend.

In its December 2 order for benefits, the trial court noted that although Employee was a poor historian, the discrepancies in his testimony were "reasonable under these circumstances," and it found Employee likely to prove the time and place of the occurrence of his injury at trial. The court then balanced the opinions of the two medical experts and found that, regardless of which opinion it chose to accept, it could not accept Employer's argument that Employee's preexisting conditions were the primary cause of the progression of his infection into necrotizing fasciitis and the resulting amputation. The court reasoned that if an underlying condition causes a more severe reaction to a work injury than would otherwise be expected, it should not "foreclose recovery." It ordered Employer to pay all prior medical bills and to provide ongoing treatment with Dr. Karen Bloch, the physician

6

Employee had selected from Employer's panel.[2]  The court also found Employee was "presumably" unable to work for at least the duration of his hospital stay, but that it could not calculate the amount owed as a wage statement had not been filed.  It, therefore, reserved its ruling on the temporary total disability ("TTD") issue.  Finally, the court ordered Employer to provide a panel of psychiatrists, observing that Employer had presented "no contrary medical opinion" to call into question Employee's mental injury.  Employer has appealed.

## Standard of Review

The standard we apply in reviewing a trial court's decision presumes that the court's factual findings are correct unless the preponderance of the evidence is otherwise.  *See* Tenn. Code Ann. § 50-6-239(c)(7) (2025).  When the trial judge has had the opportunity to observe a witness's demeanor and to hear in-court testimony, we give considerable deference to credibility determinations made by the trial court.  *Madden v. Holland Grp. of Tenn., Inc.*, 277 S.W.3d 896, 898 (Tenn. 2009).  However, "when it comes to deposition testimony, an appellate panel is in the same position as the trial court to make credibility determinations."  *Edwards v. Peoplease, LLC*, No. W2024-01034-SC-R3-WC, 2025 Tenn. LEXIS 514, at *18 (Tenn. Dec. 22, 2025).  Thus, when medical proof is presented by deposition, "the reviewing court may draw its own conclusions about the weight and credibility of the expert testimony."  *Id.*  Moreover, the interpretation and application of statutes and regulations are questions of law that are reviewed *de novo* with no presumption of correctness afforded the trial court's conclusions.  *See Mansell v. Bridgestone Firestone N. Am. Tire, LLC*, 417 S.W.3d 393, 399 (Tenn. 2013).  We are also mindful of our obligation to construe the workers' compensation statutes "fairly, impartially, and in accordance with basic principles of statutory construction" and in a way that does not favor either the employee or the employer.  Tenn. Code Ann. § 50-6-116 (2025).

## Analysis

Employer raises four issues on appeal, which we restate as follows: (1) whether Employee sustained an injury in the course and scope of his employment; (2) whether Employee's necrotizing fasciitis and resulting amputation were primarily caused by a work injury; (3) whether Employee is entitled to past and future medical benefits; and (4) whether Employee is entitled to TTD.  Employee argues that he met his burden at the expedited hearing and, therefore, the trial court's order should be affirmed.

---

[2] Although the trial court calculated Employer's obligation for past medical expenses to be $749,523.23, the documentation contained in the record does not reflect that total.

*Evidence of Work-Related Injury*

Employer contends that Employee's report of the alleged accident is not credible, as he has testified under oath to two different mechanisms of injury and three different dates of injury. In response, Employee notes the amount of time that has passed since the initial incident and the extensive amount of medical treatment he has undergone since then for his necrotizing fasciitis and resulting arm amputation and his nonwork-related heart and lung conditions. Furthermore, at oral argument, counsel for Employee stated that Employee's descriptions of how the injury occurred are not inconsistent because the safety belts had to be undone in order to open the door to the trailer, both of which were described by Employee as causes of the injury.

It is well established that "[w]hen the trial court has heard in-court testimony, considerable deference must be afforded in reviewing the trial court's findings of credibility and assessment of the weight to be given to that testimony." *Tryon v. Saturn Corp.*, 254 S.W.3d 321, 327 (Tenn. 2008). In *Jones v. AT&T Services, Inc.*, No. 2021-08-0310, 2021 TN Workers' Comp App. Bd. LEXIS 41 (Tenn. Workers' Comp. App. Bd. Nov. 8, 2021), the employer argued on appeal that the various accounts of the alleged work accident offered by the employee made his testimony not credible. *Id.* at *8-9. We rejected that argument, explaining:

> While there may be inconsistencies in the various accounts of the events given by [the employee], the trial court appropriately considered the strengths and weaknesses of the relevant evidence in determining whether [the employee] had come forward with sufficient evidence to indicate a likelihood of prevailing at trial. Based upon our review of the record, we cannot conclude there is clear and convincing evidence that [the employee's] testimony forming the basis of the trial court's order was not credible.

*Id.* at *9-10.

Here, as noted by the trial court, "[e]ven if minor and insignificant details vary, an injured worker should not be penalized simply for being a poor historian." *Orman v. Williams Sonoma, Inc.*, 803 S.W.2d 672, 677 (Tenn. 1991). Although Employee expressed uncertainty as to the precise *date* the injury occurred within a three-day period, he consistently testified that it occurred on the Wednesday of that week. Furthermore, Employer has not come forward with sufficient evidence that the scratch, cut, or laceration occurred in any manner other than that described by Employee. Its implication that Employee must have scratched his arm while building a cabinet the weekend before is nothing more than speculation. Both Employee and his wife testified that Employee did not have any cuts, lacerations, or scratches before he left for work on Tuesday, April 18, 2023. In sum, we conclude the preponderance of the evidence supports the trial court's determination that Employee is likely to prove at trial that he received a cut or laceration

on his left arm in the course and scope of his work as a truck driver for Employer, which led directly to the infection.

*Necrotizing Fasciitis*

Employer contends that, even if the cut to Employee's arm happened while he was at work, the work accident was not the primary cause of his necrotizing fasciitis. Pointing to Dr. Cumbo's testimony in support, Employer argues that were it not for Employee's preexisting vascular condition, smoking history, undiagnosed cancer, and compromised immune system, the infection would not have worsened to the point of needing an amputation. Employer further asserts that Dr. Gelfand did not know about Employee's significant preexisting health issues at the time of his deposition and, therefore, his causation opinion should be discredited.

Generally, in a case involving preexisting conditions, the question is whether the work accident caused a temporary or permanent aggravation of that condition. "[A]ggravation means an intensification or worsening of a preexisting disease, condition[,] or ailment, permanent or not, that contributes more than fifty percent in causing death, disability[,] or the need for medical treatment." *Edwards*, 2025 Tenn. LEXIS 514, at *26. However, in the present case, the issue is not whether the work accident aggravated a preexisting condition but whether the preexisting condition caused the infection from the work injury to worsen, and, if so, whether that bars Employee's recovery.

Both Drs. Gelfand and Cumbo agreed that the extent of Employee's infection was rare, and Dr. Gelfand admitted that Employee's underlying medical conditions contributed to the development of the necrotizing fasciitis. Dr. Cumbo testified Employee's "poor health and treatment delay" were the primary causes of his severe reaction to the infection, but he also acknowledged that the introduction of the bacteria into Employee's body was a "direct inoculation" from a cut or abrasion that, in turn, led to the development of his necrotizing fasciitis. Moreover, it is well settled that "an employer takes an employee 'as is,'" and, thus, assumes responsibility for any condition primarily caused by a work accident, even if that condition is more severe in that particular employee than it would be in other employees. *See Bradshaw v. Jewell Mechanical, LLC*, No. 2014-06-0056, 2015 TN Wrk. Comp. App. Bd. LEXIS 16, at *15 (Tenn. Workers' Comp. App. Bd. June 4, 2015) (citing *Hill v. Eagle Bend. Mfg., Inc.*, 942 S.W.2d 483, 488 (Tenn. 1997)). Finally, Employer points to no precedent supporting its argument that an employee's poor health status that contributes to the severity of the work-related condition limits the employee's entitlement to workers' compensation benefits.

Further, the Tennessee Supreme Court has made clear that every "direct and natural consequence" of a work-related accident is compensable. *See, e.g.*, *Hudgins v. Glob. Pers. Sols., Inc.*, No. E2023-00792-SC-R3-WC, 2024 Tenn. LEXIS 86 (Tenn. Workers' Comp. Panel Mar. 5, 2024). In *Hudgins*, the Supreme Court's Special Workers' Compensation

Appeals Panel addressed the employee's burden of proof in circumstances where "a subsequent or secondary medical condition develops after a work-related injury." *Id.* at *9. The Court determined that an employee must come forward with sufficient evidence to prove that the subsequent injury or medical condition arose primarily out of the work accident. *Id.* Here, the evidence supports a finding that Employee suffered a work-related accident resulting in a scratch or laceration to his arm. He presented expert medical testimony that the arm laceration led directly to an infection, which led directly to the development of necrotizing fasciitis, necessitating an amputation. In short, we agree with the trial court that even if Employee's reaction to the infection was more severe because of his preexisting conditions, the injury itself arose primarily from his work accident. Thus, Employee is entitled to benefits for every direct and natural consequence of his work-related accident, including the infection and the development of his necrotizing fasciitis. As such, that portion of the court's order is affirmed.

*Past and Future Medical Benefits*

Employer next argues it should not have to provide past, ongoing, or future medical benefits pursuant to Tennessee Code Annotated section 50-6-204(a)(1)(A). Regarding the payment of past medical benefits, Employer argues there is no medical proof that the medical expenses are reasonable, necessary, and causally related to the work injury. In response, Employee contends that "[a]n award may properly be based upon medical testimony to the effect that a given incident could be the cause of the employee's injury" and that "[a]ny reasonable doubt . . . is to be resolved in favor of the employee." This, however, is an inaccurate statement of the law following the enactment of the 2013 Workers' Compensation Reform Act, which, as we noted above, mandates an interpretation that does not favor either the employer or the employee. *See* Tenn. Code Ann. § 50-6-116 (2025).

Furthermore, establishing causation to a reasonable degree of medical certainty requires that a physician opine "it is more likely than not considering all causes, as opposed to speculation or possibility," not that it "*could* be" the cause. Tenn. Code Ann. § 50-6-102(12)(D) (2025); *see also Scott v. Integrity Staffing Sols.*, No. 2015-01-0055, 2015 TN Wrk. Comp. App. Bd. LEXIS 24, at *10-11 (Tenn. Workers' Comp. App. Bd. Aug. 18, 2015) (comparing pre-reform versus post-reform medical causation standards).

Despite this distinction, both experts in the present case testified the medical treatment Employee received at Vanderbilt was necessary and, in the case of Dr. Gelfand, "life[-]saving." As articulated above, Dr. Gelfand also testified the amputation was primarily caused by the injury at work. As such, we agree with the trial court that Employee met his burden of proof at the expedited hearing regarding medical causation. Therefore, Employer is responsible for any and all reasonable and necessary medical treatment arising from Employee's visit to the emergency room through his release from Vanderbilt, although we modify the order of the trial court to reflect that Employer is

responsible for the payment or reimbursement of all causally-related medical expenses subject to any applicable fee schedule or other payment arrangement as may be reached between Employer and the medical provider. *See* Tenn. Code Ann. § 50-6-226(a)(4) (2025) and Tenn. Comp. R. & Regs. 0800-02-18-.01 *et seq.* As to his entitlement to future medical treatment, we conclude Employee met his burden in establishing that he is likely to prove at trial his entitlement to ongoing care to treat his necrotizing fasciitis and amputation, and Employer is obligated to provide "such medical and surgical treatment" as has been "made reasonably necessary" by his work injury. Tenn. Code Ann. § 50-6-204(a)(1)(A) (2025). Given that Employer provided a panel of physicians from which Employee selected Dr. Karen Bloch, we agree that Employer is obligated to authorize treatment with Dr. Bloch or, if Dr. Bloch declines to treat Employee or refers him to another specialist, with another panel-selected physician.

We further conclude Employee has satisfied his burden as it relates to his psychological injury and need for treatment. Dr. Kyser provided an opinion that Employee's preexisting depression and anxiety had worsened as a result of his amputation, which was supported by Employee's testimony. Employer did not offer any countervailing evidence or expert opinion to rebut that proof. Therefore, we affirm the portion of the trial court's order directing Employer to provide a panel of three psychiatrists.

*TTD Benefits*

Finally, Employer argues it should not be required to pay TTD benefits. The trial court stated it presumed Employee could not work while he was receiving inpatient care at Vanderbilt. However, as no wage statement was filed by either party, the court could not calculate an average weekly wage pursuant to Tennessee Code Annotated section 50-6-102(3)(A), and it reserved its ruling on the issue.

"[T]he employee . . . has the burden of proof on all essential elements of a claim." *Scott*, 2015 TN Wrk. Comp. App. Bd. LEXIS 24, at *6. A court's presumption, no matter how reasonable it may seem, is not an appropriate basis for awarding TTD, and there is no medical proof in the record as to the duration or extent of Employee's temporary disability following his discharge. *See Jones v. Crencor Leasing and Sales*, No. 2015-06-0332, 2015 TN Wrk. Comp. App. Bd. LEXIS 48, at *7 (Tenn. Workers' Comp. App. Bd. Dec. 11, 2015). None of the questionnaires, depositions, or medical records contained in the record discuss Employee's ability to work. In fact, Dr. Gelfand refrained from testifying regarding maximum medical improvement, stating "infectious disease people do not do that." Finally, as noted by the trial court, no wage statement has been filed by either party. Given the minimal information in the record, we conclude there was insufficient evidence to award temporary disability benefits at this stage of the case. Therefore, we vacate the portion of the trial court's order awarding TTD benefits.

**Conclusion**

For the foregoing reasons, we affirm the court's determination that Employee is likely to prove at trial that he suffered an injury at work that primarily caused his necrotizing fasciitis, amputation, and increased depression, and we affirm its award of medical benefits to Employee, with modification as to the amount of past medical bills required to be paid. We vacate the award of TTD and remand the case. Costs on appeal are taxed to Employer.